Spears & Imes LLP
767 Third Avenue
New York, NY 10017

Hon. P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

October 13, 2022

        **Re: *United States v. Rene Allard,* S8 20 Cr. 163 (PKC)**

Dear Judge Castel:

      We respectfully submit this memorandum in advance of defendant Rene Allard's sentencing in this case, which is scheduled for October 27, 2022. Mr. Allard pleaded guilty on June 2, 2022 to a Superseding Information charging him with a single count of causing the misbranding of drugs in interstate commerce with the intent to mislead, in violation of Title 21, United States Code, Sections 331 and 333(a)(2). He is the second standardbred horse trainer to be sentenced by the Court in this case following a guilty plea, and his sentencing also follows the recent sentencings of others in the horseracing industry in similar cases pending in this District before the Hon. Mary Kay Vyskocil, *United States v. Jorge Navarro, et al.,* 20 Cr. 160; the Hon. J. Paul Oetken, *United States v. Scott Robinson, et al.*, 20 Cr. 162; and in the Middle District of Pennsylvania before the Hon. Sylvia H. Rambo, *United States v. Murray Rojas*, 15 Cr. 169.

      Mr. Allard faces an advisory Guidelines sentencing range of 36 months' imprisonment, which is also the statutory maximum. The United States Probation Department recommends a below-Guidelines sentence of 24 months' imprisonment.

      We agree with the Probation Department that a below-Guidelines sentence is warranted. We respectfully submit that a Guidelines sentence would exceed the length of prison time necessary to comply with the purposes set forth in Title 18, United States Code, Section 3553(a); would not account for the history and characteristics of the defendant; and would create unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. Mr. Allard understands the seriousness of his offense and is not asking for a sentence of time served. However, in light of the Section 3553(a) factors, and in particular the need to account for the relative culpability of other defendants who have already been sentenced, a sentence significantly below the Guidelines range of 36 months' imprisonment is merited. We respectfully ask that the Court impose a sentence of no more than 18 months' imprisonment on Mr. Allard.

**1.**     **Nature and Circumstances of the Offense**

      For most of his adult life, Mr. Allard has made a living training horses to compete in harness races. Part of his job was to treat horses with vitamins, drugs, or other

Spears & Imes LLP
767 Third Avenue
New York, NY 10017

substances to ensure that they recovered from injuries and remained in good health. During the period of time charged in the Superseding Information, in order to maintain a competitive edge, he did something that was wrong and that he never should have done: he obtained prescription drugs for horses in bulk, rather than on an individually prescribed basis, with the understanding that the way he was obtaining the drugs would mislead regulators.  Although Mr. Allard always purchased drugs from licensed veterinarians, he knew that what he was doing was wrong, and he was motivated in part by a desire to improve the performance of the horses he was training and thus to win more races.  By engaging in this conduct, he compromised the integrity of the sport that gave him a sense of purpose, and the potential well-being of the animals that he loves and around whom he has lived his entire life.  He is deeply sorry for what he has done, and he understands that the toll this case has taken, and will continue to take, on his family's life is something that he caused through his own choices and for which he bears total responsibility.

While his offense conduct was indisputably wrong, certain aspects of it bear emphasis here, as they contribute to the much broader set of reasons discussed below why a sentence significantly below the Guidelines range is appropriate.  In particular, Mr. Allard did not treat horses with, or ask veterinarians to supply him with, the blood-doping agent known as Epogen.  *Cf.* October 12, 2022 Presentence Investigation Report ("PSR") ¶ 17 (specifying that co-defendant Richard Banca paid co-defendant Louis Grasso to write prescriptions for Epogen and then used Epogen on horses).  The Government has consistently taken the position that Epogen is an especially noxious performance-enhancing drug.  *See* Sept. 20, 2022 Transcript of Sentencing of Richard Banca ("Banca Tr.") at 18-19;[1] *see also, e.g.*, Sept. 8, 2022 Government Memorandum in Advance of Sentencing of Richard Banca ("Gov't Banca Mem.," 20 Cr. 163 Dkt. 263) at 5 (Government advocating the significance of Mr. Banca's use of Epogen in determining the appropriate sentence); March 3, 2022 Transcript of Sentencing of Christopher Oaks ("Oaks Tr.," 20 Cr. 160 Dkt. 818) at 14 (same with respect to Mr. Oaks)).  The fact that Mr. Allard did not use Epogen does not excuse his conduct, but it does distinguish his conduct in an important way from that of other horse trainers who have been charged by the Government in these cases.

We also note that the PSR includes a finding that "[h]orses under Allard's care died during the course of the charged offense."  PSR ¶¶ 18, 29.  We do not dispute the literal accuracy of this statement, to the extent it means that one or more horses died over the five-year period covered by the Superseding Indictment, but we do dispute any inference – to the extent the Government argues for one – that Mr. Allard's offense conduct caused the death of any horse.  We are aware of no medical records or other evidence in the discovery to support such a finding, and there is no basis for one.  It

---

[1] The transcript of Mr. Banca's sentencing is attached hereto as Exhibit A.

Spears & Imes LLP
767 Third Avenue
New York, NY 10017

would not be right for the Government to speculate about the death of a horse and to ask the Court to factor that speculation into the determination of a sentence.[2]

## 2. History and Characteristics of the Defendant

Mr. Allard's history and characteristics counsel in favor of a sentence that is significantly below 36 months. Mr. Allard has no criminal history, and his two years on bail in this case were without incident. *See* PSR at page 24. He has an eighth-grade education. *See* PSR ¶ 67. He is a family man who lives with his fiancé and their two young children, ages three and four, for whom he is the sole financial provider, *see* PSR ¶ 54, and for whom the effect of his incarceration will be devastating, a reality that is referenced in the Probation Department's sentencing recommendation of 24 months, *see* PSR at page 24. Moreover, and as also discussed in the Probation Department's recommendation, Mr. Allard has a number of serious health problems, including lung complications, breathing complications that require medication, chest pains, blood pressure that requires medication, extreme fatigue, hypoglycemic episodes, and "permanent and consequential limitations" resulting from a car accident. (PSR ¶¶ 60-62).

Due to his immigration status, Mr. Allard faces the possibility of removal from the United States following the completion of his sentence, a potential consequence of profound significance in light of the fact that his children are United States citizens whose lives are here, not in Canada. Mr. Allard's immigration status also has the practical effect of extending any term of incarceration beyond what it would be if he were a citizen, placing him at a disadvantage relative to codefendants who are citizens. The First Step Act allows eligible federal inmates to receive Earned Time Credits towards pre-release custody. A prisoner "who successfully completes evidence-based recidivism reduction programming or productive activities . . . . earn[s] "10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities." 18 U.S.C. § 3632(d)(4)(A)(i). Furthermore, "a prisoner determined by the Bureau of Prisons to be at a minimum or low risk for recidivating,[3] who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful

---

[2] The original Complaint in the case against Mr. Allard, *see* 20 Cr. 163 Dkt. 1 at ¶ 5(d), quoted from a wiretap of co-defendant Louis Grasso's phone an excerpt of a conversation between Mr. Grasso and an individual named Ross Cohen, in the course of which Mr. Grasso and Mr. Cohen speculated about the possibility that horses had died from something that Mr. Allard had given them. Mr. Allard was not on this phone call and thus had no opportunity to refute anything Mr. Grasso or Mr. Cohen were saying. There is nothing to corroborate the comments made by Mr. Grasso and Mr. Cohen, which were untrue. The excerpt does not provide a basis to conclude that Mr. Allard's offense conduct killed a horse.

[3] The Probation Department made a finding that Mr. Allard presents a low risk of recidivism. *See* PSR at page 24.

Spears & Imes LLP
767 Third Avenue
New York, NY 10017

participation in evidence-based recidivism reduction programming or productive activities." 18 USCS § 3632(d)(4)(A)(2). However, 18 U.S.C. § 3632(d)(4)(B)(iii) provides that "[a] prisoner may not earn time credits under this paragraph for an evidence-based recidivism reduction program that the prisoner completed . . . if that prisoner is an inadmissible or deportable alien under the immigration laws (as such term is defined in section 101 of the Immigration and Nationality Act)[.]" 8 USC § 1101(3) defines "alien" as "any person not a citizen or national of the United States." Mr. Allard is thus ineligible for Earned Time Credits that would reduce the practical length of time that he will serve in prison – not because of the offense conduct itself, but because he simply was not born here and failed to pursue citizenship earlier in his life. His immigration status effectively makes any term of imprisonment last for more days than it would if he were a citizen.[4]

In addition to the history and characteristics described above, and most importantly, Mr. Allard is an extraordinary human being whose character and deeds warrant a below-Guidelines sentence. The letters that have been submitted on his behalf attest to this. Mr. Allard's empathy and concern for other people, which he actually translates into actions that improve their lives, are evident in every letter. His fiancé, Joanie Leonard, calls him an "exceptional father" who is deeply involved in their children's lives, *see* Ex. B at 1, a theme that is echoed by non-family members of Mr. Allard who regularly see how he interacts with his children, *see* Letter of Jessica Derue (Ex. C) at 1; Letter of Kapildeo Singh (Ex. D) at 1. Ms. Leonard also relates how at different times during his career Mr. Allard donated purse winnings to a young man who had lost his father to cancer, and to a jockey who had been injured. *See* Ex. B at 1. These anecdotes are a microcosm for the warmth and generosity that Mr. Allard has demonstrated throughout his life. One of the most remarkable letters submitted on his behalf, by his friend Donald MacRae, discusses the kindness and time that Mr. Allard devoted to Mr. MacRae's son, who suffered from Muscular Dystrophy, and also relates that Mr. Allard once tracked down the family of a young man who was eligible to participate in the Special Olympics and paid for his family to make the trip. Ex. E at 1. These are the actions of a sincere and good person who contributes meaningfully to his community.

Mr. Allard's support also comes from people within the horseracing industry. They repeatedly convey their experience that he is honest and honorable. *See* Letter of Kenneth Holliday (Ex. F) at 1 ("Rene has always been straightforward, honest with me, and as honest as anyone I have worked with in this industry . . . . I completely support Rene, trust him in business, and most importantly, I would trust him with any of my horses."); Ex. D (Singh) ("There is no man finer and more honest than Rene."); (Letter of Ted Smith, former President and Chief Executive Officer of Standardbred Canada (Ex. G) at 1-2 ("I describe Rene as a good, solid human being. I am not shy to describe him as

---

[4] Mr. Allard's immigration status may also preclude him from serving his sentence at a minimum security prison.

Spears & Imes LLP
767 Third Avenue
New York, NY 10017

a personal friend. He is a friend of mine and will continue to be so after his sentencing. I will proudly defense his name and reputation."). While these sentiments do not undo Mr. Allard's offense conduct, they provide a broader context for it: Mr. Allard is a genuinely good person whose mistakes are not characteristic. Tellingly, the support of Mr. Allard's colleagues and competitors in the horseracing industry goes well beyond a recounting of his integrity in his business dealings or his treatment of animals, although it does include those things.[5] For example, Mr. Holliday relates that Mr. Allard helped him restart his business after an injury forced him to be absent from it for three years. Ex. F at 1. Likewise, another trainer, Mike Carruba, writes that he remembers Mr. Allard stepping in to help the wife of a friend in the horseracing industry after that friend had passed away, and that Mr. Allard "brought along others" to help provide support as well. Ex. J at 1.

   Perhaps no letter submitted in support of Mr. Allard sums up his character, and the appropriateness of leniency at his sentencing, more elegantly than the one submitted by his friend and former groom, Travis Henry, which is attached as Exhibit K. Mr. Henry's letter describes what Mr. Allard was like to work with: "He treats his employees with respect and kindness." Ex. K at 1. It portrays how committed Mr. Allard is to his friends: "Rene paid for the funeral when my father died because he knew it would be a financial challenge for me." *Id*. And most of all, it depicts the extraordinary compassion, evident in each of the letters submitted on his behalf, that Mr. Allard feels, and acts upon, for the people he meets. Mr. Henry recalls that "Rene regularly hired people who had experienced significant life challenges. He wanted to give them a second chance." *Id*. On one occasion, "[Rene] bailed a friend's son out of jail. He assumed responsibility with the court as his guardian and gave him a job. He held him accountable, set boundaries, and got him into a program. Two years later, the young man was healthy and ready to move forward with his life." *Id*. This brief vignette captures much of what makes Mr. Allard unique, and of why those who know him love him. As another longtime friend of Mr. Allard's, Isaac Waxman, put it with similar elegance: "Some people put more good than bad into this world and nobody is perfect. It is my belief that Rene has put much more good into this world." Letter of Isaac Waxman (Ex. L) at 1. Mr. Waxman's view of Mr. Allard is one that is shared by essentially everyone who knows him.

   Mr. Allard's personal history and characteristics, on their own, merit a below-Guidelines sentence. He is a fundamentally good and decent person who supports his family, takes pains to improve the lives of those around him, and has an overwhelmingly positive impact on the community. He will contribute meaningfully to society when he completes his sentence. Indeed, he has already had a job for the past five months helping

---

[5] A horse trainer who was a competitor of Mr. Allard's, Carl Jamieson, relates that based on his observations, Mr. Allard's practice was to "do what is best for the horse. Not do what we have to do to win." Ex. H at 1. Likewise, a horse owner and attorney who has known Mr. Allard for decades, Howard Taylor, and who has vast experience representing trainers in administrative actions before racing commissions, vouches from personal experience that Mr. Allard "places his horses' condition and care primary." Ex. I at 1.

Spears & Imes LLP
767 Third Avenue
New York, NY 10017

to start "showjumper" horses, and has demonstrated sufficient integrity and reliability in that job that his boss writes to this Court that he will be proud to have Mr. Allard on his staff full time at the conclusion of Mr. Allard's term of imprisonment. *See* Letter of Nathan Leo Grossman (Ex. M) at 2. This is a remarkable testament for someone to make about his employee of five months' time to a federal judge in connection with sentencing, and it speaks to the regard that people have for Mr. Allard as a person.

3.   **Sentences of Others in the Horseracing Industry**

A comparison of Mr. Allard's culpability with that of others in the horseracing industry who have been sentenced for similar crimes also counsels strongly in favor of a sentence well below the Guidelines range. We discuss below the recent sentences that we believe are the most relevant to this analysis. No part of the discussion below is intended to disparage any of the individuals mentioned; rather, it is strictly intended to show that in order to situate Mr. Allard fairly among certain other defendants, a sentence of no more than 18 months' imprisonment is warranted.

   A.   **The Sentence Imposed on Richard Banca**

Last month, this Court sentenced Mr. Allard's co-defendant Richard Banca to a below-Guidelines sentence of 30 months' imprisonment. *See* Ex. A. Like Mr. Allard, Mr. Banca faced an advisory Guidelines sentencing range of 36 months, which was also the statutory maximum. *See id*. Also like Mr. Allard, Mr. Banca was a standardbred horse trainer. *See id*. However, a host of facts, including representations made by the Government, make clear that Mr. Allard bears less culpability than Mr. Banca and merits a shorter sentence. Among other things:

- The Government stated at Mr. Banca's sentencing that "Banca's conduct falls on the more serious scale of horse doping as compared to other horse trainer defendants." Ex. A at 18-19.
- According to the Government, Mr. Banca obtained *hundreds of prescriptions and refills* for Epogen, which Mr. Allard did not use. Gov't Banca Mem. at 2.
- According to the Government, Mr. Banca supervised Connor Flynn, a codefendant in this case in his own right who participated in "doping" horses. *Id.*
- According to the Government, Mr. Banca routinely purchased drugs from a non-veterinarian, which Mr. Allard did not do. *Id.*

In light of the above, principles of basic fairness, as well as Section 3553(a), require that Mr. Allard be given a significantly shorter sentence than Mr. Banca.

   B.   **The Sentence Imposed on Rick Dane, Jr.**

On September 9, 2022, Judge Vyskocil sentenced Rick Dane, Jr., a thoroughbred horse trainer, to a below-Guidelines sentence of 30 months' imprisonment. *See*

Spears & Imes LLP
767 Third Avenue
New York, NY 10017

Judgement in a Criminal Case as to Rick Dane, Jr. (20 Cr. 160 Dkt. 929). Mr. Dane faced an advisory Guidelines sentencing range of 36 months' imprisonment, which was also the statutory maximum. *See* Gov't Dane Mem. (20 Cr. 160 Dkt. 920) at 1. Mr. Dane pleaded guilty only after Judge Vyskocil had decided substantive motions and only after a co-defendant in his indictment, Seth Fishman, had been convicted at trial. *See id*. Mr. Dane was more culpable than Mr. Allard in a number of different ways, including that he not only administered performance enhancing drugs to horses under his care, but also assisted the distribution of drugs by others. *See id*. at 5-6. He also, unlike Mr. Allard, assisted a distributor of performance enhancing drugs – Lisa Gianelli, who was convicted at trial – to find new clients for her company's illicit trade. *See id*. at 6. He did this in exchange for free drugs that he could use to dope his horses. *Id*.[6] It would not be just for Mr. Allard to receive a sentence equal to that of Mr. Dane, given Mr. Dane's greater level of culpability.

### C. The Sentence Imposed on Marcos Zulueta

On February 24, 2022, Judge Vyskocil sentenced Marcos Zulueta, a thoroughbred horse trainer, to a Guidelines sentence of 33 months' imprisonment. *See* Feb. 24, 2022 Transcript of Sentencing of Marcos Zulueta ("Zulueta Tr."), 20 Cr. 160 Dkt. 809. Because the intended loss amount associated with Mr. Zulueta's conduct was lower than that associated with the conduct of Mr. Allard or Mr. Banca, his advisory Guidelines range was 33 to 36 months' imprisonment. *See id.* at 20.[7] However, as noted by Judge Vyskocil and the Government alike, aspects of Mr. Zulueta's conduct were "shocking," meriting a sentence that was higher than that imposed on Mr. Banca and that should be much higher than the sentence that is imposed on Mr. Allard. Among other things:

- According to the Government, Mr. Zulueta encouraged the Government's lead defendant in its thoroughbred horseracing indictment, Jorge Navarro, to keep giving horses a drug known as "monkey" despite the explicit understanding of both men that this drug was "breaking horse[s] down." Gov't Zulueta Mem. (20 Cr. 160 Dkt. 773) at 3.

---

[6] While Mr. Dane made initial steps toward cooperating with the Government, he was found not to be forthcoming, and was not extended a cooperation agreement. *See* 20 Cr. 160 Dkt. 925.

[7] For the avoidance of doubt, the intended loss amount attributed to Mr. Allard and reflected in the plea agreement is based on the Government's calculation of total purse winnings and does *not* reflect how much money Mr. Allard, as a trainer, personally made in his career. The intended loss amount exponentially dwarfs his career earnings. Although we do not dispute the Government's calculation of the intended loss amount or the correctness of using an intended loss figure under the United States Sentencing Guidelines, as a practical matter the intended loss amount is untethered from any benefit that Mr. Allard derived from his offense conduct. It should not be a substantial driver of the length of his sentence.

Spears & Imes LLP
767 Third Avenue
New York, NY 10017

- According to the Government, Mr. Zulueta was personally captured on a wiretap stating, in substance, that he had almost killed a horse, without apparent concern. *Id.* at 6.
- According to the Government, Mr. Zulueta was captured on a wiretap telling Mr. Navarro that he used a performance enhancing drug that he knew to be "the one that fuck[s] up the horses." (*Id.* at 7).
- Judge Vyskocil found that the callousness with which Mr. Zulueta discussed horses under his care with Mr. Navarro was "shocking and egregious." Zulueta Tr. at 25-26.
- Judge Vyskocil found that Mr. Zulueta had actually "educated" Mr. Navarro – the Government's lead defendant– on "new and experimental ways to drug horses" and on the importance of concealing these methods from regulators. *Id.* at 26.
- Mr. Zulueta had three prior arrests at the time of his offense conduct, and was on probation at the time he committed his offense conduct. By contrast, Mr. Allard has no prior arrests and no prior interactions with law enforcement. *Id.* at 24.

The sentence imposed on Mr. Allard should be considerably below the sentence imposed on Mr. Zulueta.

### D. The Sentence Imposed on Christopher Oaks

On March 3, 2022, Judge Vyskocil sentenced Christopher Oaks, a thoroughbred horse trainer, to a Guidelines sentence of 36 months' imprisonment, which was also the statutory maximum term that could be imposed. *See* Oaks Tr. Mr. Oaks, like Mr. Banca, Mr. Dane, and Mr. Zulueta, engaged in offense conduct that was demonstrably more severe than that of Mr. Allard. For example:

- According to the Government, Mr. Oaks not only used performance enhancing drugs on horses that he himself trained, but also provided performance enhancing drugs to other trainers, including Jorge Navarro. (*See* Gov't Oaks Mem. at 1; *see also id.* at 4 (emphasizing that Mr. Oaks "provided drugs to others" and "encouraged others . . . to race doped horses"). This puts him in the position of a supplier, which is fundamentally different from the position of Mr. Allard, and extends the reach of his (Mr. Oaks's) conduct beyond that of trainers who stand convicted of misdeeds relating to their own programs.
- According to the Government, Mr. Oaks helped Mr. Navarro "dope" a racehorse that had undergone three recent knee surgeries in order to participate in a race with a $2.5 million purse. (*Id.* at 2).
- According to the Government, Mr. Oaks used his own shell company to cover up his misconduct, a form of fraud that was more sophisticated than that imputed to Mr. Allard. (*Id.* at 5).

Spears & Imes LLP
767 Third Avenue
New York, NY 10017

Mr. Allard merits a sentence that is far shorter than that imposed on Mr. Oaks, who not only administered misbranded drugs to horses under his own care but functioned as a supplier of such drugs to the Government's lead defendant.

### E.     The Sentence Imposed on Murray Rojas

On May 6, 2019, in a case that was pending in the United States District Court for the Middle District of Pennsylvania, the Hon. Sylvia H. Rambo sentenced Murray Rojas, a standardbred horse trainer, to a term of 27 months' imprisonment following her conviction at trial on 14 counts, including conspiracy to commit the felony offense of misbranding.  *See* May 6, 2019 Transcript of Sentencing of Murray Rojas ("Rojas Tr.," 15 Cr. 169 Dkt. 203).  In its case before Judge Vyskocil, the Government has made reference to the case against Ms. Rojas, and has described her offense conduct as "doping horses."  *See* Gov't Rhein Mem, 20 Cr. 160 Dkt. 564 at 1.  Ms. Rojas did not accept responsibility for her offense conduct.  Mr. Allard should receive a sentence that is lower than the one imposed on Ms. Rojas, a horse trainer convicted of "doping horses" who did not accept responsibility for her conduct.[8]

### F.     The Sentence Imposed on Kristian Rhein

On January 5, 2022, Judge Vyskocil sentenced Dr. Kristian Rhein to a term of 36 months' imprisonment, which was the advisory Guidelines sentence as well as the statutory maximum term that could be imposed.  *See* Jan. 5, 2022 Transcript of Sentencing of Kristian Rhein ("Rhein Tr.," 20 Cr. 160 Dkt. 715).  Dr. Rhein was a veterinarian, placing him in a higher category of culpability than Mr. Allard.  Indeed, he was a leader of his veterinary practice, a field that Judge Vyskocil noted was a special calling.  *See* Rhein Tr. at 37.  He had the benefit and responsibility of an advanced medical degree during the time that he engaged in his offense conduct.  As a veterinarian, Dr. Rhein also distributed illicit substances to multiple horse trainers, *see* Gov't Rhein Mem. at 1, causing a bigger impact than that of a single horse trainer.  In addition, the intended loss amount attributed to Dr. Rhein was between $25,000,000 and $65,000,000 – a higher range than that attributed to Mr. Allard.  *See* Rhein Tr. at 34.

As well as being a licensed veterinarian, according to the Government, Dr. Rhein invested financially in a company that marketed and sold a misbranded performance-enhancing drug which Dr. Rhein took it upon himself to "peddle."  Gov't Rhein Mem. at 1.  His roles as a veterinarian and a financial investor were frequently mixed and corrupted, including through his instructing another veterinarian not to document their use of a particular performance-enhancing drug.  *See id.* at 4.  The Government also relied at sentencing on the fact that once Dr. Rhein learned of a federal investigation into doping, he brainstormed ways to surreptitiously speak with another subject of the

---

[8] On September 28, 2022, the case against Ms. Rojas was dismissed on the Government's motion, due to a legal error that was conceded by the United States Solicitor General's Office.

Spears & Imes LLP
767 Third Avenue
New York, NY 10017

investigation who had been approached by the FBI. *See id.* at 5. It would not be reasonable for Mr. Allard to receive a sentence that was equal or even close to that of Dr. Rhein, who (based on representations by the Government) engaged in conduct that was more sophisticated, more deceptive, and more egregious.

### G. The Sentences Imposed on Scott Robinson and Scott Mangini

There are two defendants in the Government's recent horseracing industry prosecutions, including one (Scott Mangini) who, like Mr. Allard, pleaded guilty after motions *in limine* had been filed and within several weeks of trial, who received sentences of 18 months' imprisonment. We respectfully submit that the sentence imposed on Mr. Allard should not exceed these sentences, in order to avoid unwarranted sentencing disparities between similarly situated defendants. *See* 18 U.S.C. § 3553(a)(6).

On September 10, 2021, Judge Oetken sentenced Scott Mangini to a term of imprisonment of 18 months. *See* Sept. 10, 2021 Transcript of Sentencing of Scott Mangini ("Mangini Tr.," 20 Cr. 162 Dkt. 127). Mr. Mangini pleaded guilty to one count of participating in a conspiracy to adulterate and misbrand drugs, in violation of Title 18, United States Code, Section 371. He faced a Guidelines sentence of five years' imprisonment, which was also the statutory maximum. The Government viewed Mr. Mangini, who held multiple pharmaceutical licenses,[9] as having been "at the helm" of an illegal scheme to create, market, and distribute adulterated and misbranded drugs across the country for nearly a decade. Gov't Mangini Mem., 20 Cr. 162 Dkt. 117, at 1). The Government described Mr. Mangini's conduct as "particularly pernicious." *Id.* at 2. The Government emphasized in connection with sentencing that Mr. Mangini had operated under the auspices of a legitimate pharmacy, which gave his actions a false medical veneer and constituted an abuse of the public trust. *See id.* at 2. The Government also argued that Mr. Mangini exhibited a total disregard of information that horses who were receiving his drugs were becoming ill. *See id.*. Finally, the Government stressed that Mr. Mangini was in the position of a "suppli[er]." *Id.*

The facts summarized above make clear that Mr. Allard should not receive a sentence that is longer than the one imposed on Mr. Mangini. Mr. Allard compares favorably to Mr. Mangini in almost every respect for purposes of assessing his culpability. He did not have a pharmaceutical or medical license; he was not "at the helm" of a large scheme; he was not involved in the creation, marketing, or distribution of drugs; and he was not a supplier of drugs. None of this is to minimize Mr. Allard's offense conduct, which was serious and merits punishment. However, he is not more culpable than Mr. Mangini, and his sentence should not exceed the one imposed on Mr. Mangini.

---

[9] The Government stressed that Mr. Mangini's pharmaceutical licenses gave him more "training, expertise, and knowledge" than a defendant who did not possess a pharmaceutical license. Gov't Mangini Mem., 20 Cr. 162 Dkt. 117, at 2.

Spears & Imes LLP
767 Third Avenue
New York, NY 10017

Similarly, Mr. Allard's sentence should not exceed the one imposed on Scott Robinson, whom Judge Oetken sentenced to a term of 18 months' imprisonment on March 9, 2021 following his guilty plea. *See* March 9, 2021 Transcript of Sentencing of Scott Robinson ("Robinson Tr.," 20 Cr. 162 Dkt. 203). Mr. Robinson, like Mr. Mangini, faced an advisory Guidelines sentencing range of 60 months' imprisonment, which was also the statutory maximum. *See id*. As with Mr. Mangini, the Government characterized Mr. Robinson as the leader of a scheme that lasted for almost a decade to profit from the creation, marketing, sale, and distribution of performance-enhancing drugs. *See* Gov't Robinson Mem. (20 Cr. 162 Dkt. 59) at 1. Mr. Robinson made use of "various business entities" and websites to maximize his profits, and he used "elaborate means" to conceal the effects of the drugs he was marketing. *Id.* Mr. Allard, by contrast, was not involved in the creation, marketing, sale, or distribution of drugs; he was not on the supply side; and he did not use the false veneer of business entities as part of an elaborate cover-up. He should not receive a sentence that is greater than that imposed on Mr. Robinson.

**4.      Conclusion**

Rene Allard is a good and decent person who made a serious mistake in judgment. He takes responsibility for his actions and accepts that he will be punished for them. For all of the foregoing reasons, a sentence that is longer than 18 months' imprisonment would be greater than is necessary to achieve the objectives of sentencing, and would not comport with principles of fairness or with the factors set forth in Title 18, United States Code, Section 3553(a). We respectfully ask that this Court impose a sentence of not more than 18 months' imprisonment on Rene Allard.

Respectfully submitted

/s/*Max Nicholas*
Max Nicholas
Rebecca Orel
Counsel for Rene Allard