

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 20, 2022

<u>VIA ECF</u>
Hon. P. Kevin Castel
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007

              Re:    <u>United States v. Rene Allard</u>, 20 Cr. 163 (PKC)

Dear Judge Castel:

      Rene Allard ("Allard" or the "defendant"), for years, trained and raced horses through use of a covert "doping" scheme intended to corruptly gain a competitive advantage in races through the administration of performance-enhancing drugs ("PEDs"). Allard obtained from co-defendant Louis Grasso and others unapproved, untested, novel PEDs that he caused to be administered to his horses, despite the inherent risks of administering unnecessary medications to the animals under his control. Allard was motivated by greed, fraudulently earning tens of millions of dollars in purse winnings through his craven efforts to manipulate races. Indeed, the defendant personally profited from this scheme, earning an income of over $3 million in 2019. (Presentence Investigation Report ("PSR") ¶ 75. In the years leading up to his arrest, the defendant was ranked third among all standardbred racehorse trainers in North America, as measured by earnings.[1] The defendant's callous and casual doping of racehorses is serious conduct, meriting a serious punishment.

      For the reasons explained herein, and in light of this Court's prior sentencing of co-defendant Richard Banca to a 30-month term of imprisonment, the Government respectfully contends that a sentence to a significant term of imprisonment comparable to that imposed on Banca and other similarly-situated defendants is the appropriate sentence in this case.

---

[1] *See* Top Performers in 2018, U.S. Trotting Association, *available at* https://www.ustrotting.com/trackside/top_performers/stats.cfm?type=driver&sort=earn&q=T&yr =2018 (Allard ranked third with earnings of $6,339,945); Top Performers in 2019, U.S. Trotting Association, *available at* https://www.ustrotting.com/trackside/top_performers/stats.cfm?type=driver&sort=earn&q=T&yr =2019 (Allard ranked third with earnings of $5,875,255).

## I.   **Offense Conduct**

The defendant engaged in a years-long fraudulent scheme to defraud and mislead federal and state racing and drug authorities, competitors, pharmacies, and others in order to race ineligible, doped horses and illegally collect purse winnings, to the tune of over $20 million over the time period of the offense conduct. *See* PSR ¶ 5.d.

The defendant not only administered, and caused to be administered, unnecessary medications to his horses, the defendant also employed a race-day "drench": a mixture of substances administered directly into a horse's stomach through its nose using a nasogastric tube in order to provide a "boost" to a horse's performance immediately before a race. "Drenching" a horse with any substance is a prohibited and risky practice which Allard routinely employed to gain a competitive edge. In one instance, Allard was even caught red-handed tubing and drenching a horse scheduled to race that day—which no trainer is permitted to do—and abruptly fled the stall when he was caught. *See* Exhibit A.

As a reflection of Allard's commitment to his doping regimen, Allard maintained in his barn a small pharmacy's worth of drugs, including the ingredients he used to mix his own drenches, and a "shockwave" machine, which only licensed veterinarians may own. Many of Allard's drugs were stored in a room that had been misleadingly marked as if it belonged to Grasso, in a calculated effort by Allard to divert scrutiny if Allard's barn was ever inspected, by making it appear that the drugs and veterinary equipment belonged to, and were used by, a licensed veterinarian, rather than by Allard. *See* Exhibit B (photos of Allard barn premises search).

Allard cannot claim ignorance of the racing rules. Nor can he claim—as he does in his submission—that his crime was confined to "obtain[ing] prescription drugs for horses in bulk, rather than on an individually prescribed basis." Def. Sent. Mem. at 2. Allard's sanitized version of the offense conduct ignores his ultimate intent of doping horses to cheat at races. To that end, Allard's checkered history of disciplinary proceedings include the following: (1) in or about 2020, a racehorse trained by Allard tested positive for elevated levels of Lasix (furosemide), resulting in a fine of $250; (2) in or about 2019, a racehorse trained by Allard tested positive for elevated levels of TCO2, resulting in a $1,000 fine and a suspension of Allard's trainer's license[2]; (3) in or about 2016, a racehorse trained by Allard tested positive for isoflupredone, resulting in a $1,000 fine; (4) in or about October 2016, a racehorse trained by Allard tested positive for oxycodone, resulting in the temporary suspension of Allard's trainer's license and the return of purse winnings, before the positive test was rescinded. *See* Exhibit C. In addition, Allard faced a

---

[2] This ruling was ultimately reversed because of a malfunction with the state's testing equipment. As discussed herein, the defendant deployed Grasso to explain away the positive drug test to the State racing commission, which testimony was ultimately unnecessary in light of the mechanical issues that led to the reversal. *See* Exhibit D (November 1, 2019 call between Allard and Grasso, following the October 29, 2019 reversal of this violation). Although the reversal was due to a mechanical issue with the test equipment, Grasso still sought credit for testifying in Allard's defense. *See id.* (Grasso jokingly stating to Allard that the reversal was "thanks to my testimony.").

lengthy disciplinary proceeding between 2018 and 2019 after a racehorse trained by Allard tested positive for codeine and morphine.[3] The Ontario Horse Racing Appeal panel ultimately reversed the violation in December 2019, concluding that Allard had not administered those drugs to those horses.

The reversals of Allard's drug test violations are placed in their proper context by Allard's private discussions with Grasso. On November 1, 2019, after Allard had learned of the reversal of his 2019 TCO2 violation, but before Ontario's reversal, Allard and Grasso discussed both proceedings. Allard informed Grasso: "we won the case," in reference to the TCO2 violation hearing, during which Grasso testified on Allard's behalf.[4] Exhibit D. Allard explained: "basically their machine don't work. . . . They got a faulty machine. It doesn't work." *Id*. Grasso confirmed that the violation would then be "wiped out of [Allard's] record," adding: "See, thanks to my testimony." *Id*. Grasso then asked Allard "what's going on with the one in Canada?" *Id*. And after learning that the Ontario violation was still pending, Grasso remarked to Allard: "I don't think you're gonna get as lucky with that," adding, "Well you might get lucky with that, who knows?," to which Allard responded, "*After that I'm done. I'm clean, nothing*." *Id*. (emphasis added). Allard's self-incriminating admission that he needed to be "done" and get "clean" reflects his recognition that his deceptive conduct extended to the racing commissions, and was not merely a prescription fraud scheme, as he claims. *See* Def. Sent. Mem. at 2.

The defendant—like Banca—also illegally sought drugs from sources other than Grasso, including from non-veterinarian Lisa Giannelli, a drug supplier convicted in the related case *United States v. Navarro et al.*, 20 Cr. 160 (MKV). *See, e.g.*, Exhibit E (reference by Giannelli to "Allard order"); Exhibit F (discussion of order for "Renee" by Giannelli and a co-worker). Giannelli was not a veterinarian, but she sold Allard drugs with no valid prescriptions; the precise categories of drugs Allard does admit to having received and used. PSR ¶ 31.

---

[3] *See* Dave Briggs, *Allard Horse Receives Positive for Codeine and Morphine at Woodbine: Harness Racing Update 4/17/17*, RMTC Racing Medication & Testing Consortium, https://rmtcnet.com/allard-horse-receives-positive-codeine-morphine-woodbine-harness-racing-update-4717/ (last visited Oct. 17, 2022).

[4] Grasso testified in Allard's defense in connection with the 2019 investigation into the TCO2 positive which was ultimately reversed to bolster Allard's defense that the horse had not been improperly drenched. Grasso testified that the horse had a fever of 105.7, appeared severely dehydrated, with shallow breathing and a depressed demeanor. *See* Exhibit G (Excerpt from Pennsylvania Commission Ruling discussing Grasso testimony). In separate calls that did not involve Allard, Grasso had represented his willingness to lie to racing commissions, and counseled trainers to find veterinarians who were willing to do the same. *See* Exhibit H at 2 ("In fact I was just in a hearing with Rene Allard who had similar problems."); *id.* at 8-9 ("You got people off, Doc, didn't ya?" / "Well yeah. I got one guy off only because everything fell into place.").

## II.    Procedural History

The defendant was charged by Complaint in March 2020 with engaging in a conspiracy to manufacture, distribute, administer, and/or receive adulterated and misbranded PEDs intended for use on racehorses, and to secretly administer those PEDs to racehorses under scheme participants' control, with the intent to mislead and defraud various people and entities, including federal and state drug and horse racing regulators. On September 29, 2020, Allard was indicted on that same count. ECF No. 57.

On June 2, 2022, the defendant appeared before Your Honor and pleaded guilty, pursuant to a plea agreement, to a Superseding Information charging Allard with one count of substantive drug misbranding and adulteration with intent to defraud and mislead, in violation of Title 21, United States Code, Sections 331 and 333. PSR ¶ 4. Allard's change of plea followed this Court's denial of the defendants' pre-trial motion to dismiss, to suppress the wiretaps and its derivative fruits, to compel discovery, and for a bill of particulars, and within only a few weeks of the scheduled trial date. *See* ECF Nos. 127, 128, 131, 132. Allard was the last defendant in this matter to accept responsibility for his conduct.

## III.    Sentencing Factors

### a.  Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)    to afford adequate deterrence to criminal conduct;
(C)    to protect the public from further crimes of the defendant; and
(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### b. Discussion

The 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate general and specific deterrence.  A significant term of imprisonment comparable to that imposed on Banca is the appropriate sentence here—one sufficient but not greater than necessary to serve the purposes of sentencing when balancing the defendant's acceptance of responsibility, his culpability relative to other defendants, the abuse of his position as a licensed racehorse trainer with direct and unconstrained access to racehorses, and the scale of the defendant's crime.

First, as with the other trainer-defendants charged in this and related cases, Allard's offense conduct was not the result of a single lapse in judgment. The defendant engaged in the offense conduct for years. He orchestrated a sophisticated and multi-faceted doping program, engaging in repeated and persistent efforts to cheat through the use of various drugs, including those he administered the day of a race, in clear violation of applicable state racing prohibitions. Allard subjected horses to unnecessary medications that were only administered to manipulate race outcomes. As but one example, Allard called Grasso to bring to his attention a particular horse that Grasso had injected with "acid, adequan, and pre-def"; the horse subsequently could not walk or move. *See* Exhibit I at 2. A few minutes later, Grasso texted co-defendant Thomas Guido, III, jokingly stating that he was "headed to Rene Allard death camp" because he had "another emergency to look at." *Id.* at 2-3. In a call with a third party a few minutes later, Grasso stated that he had "another emergency," that it was "Rene again," and that "something ain't right" at Allard's barn. *Id.* at 7. The implication that Allard's horses repeatedly required emergency medical care is entirely consistent with the defendant's abuse of drugs to enhance his horses' performance, a scheme that carried serious, inherent risks to the health of the horses he trained. Likewise, in an intercepted call between Allard and Grasso, Allard probed Grasso for advice on injecting a "lame" horse so that it could race the next day. *Id.* at 8-9; *see also id.* at 9 (Grasso: "Is he [the horse] lame?"; Allard: "If he was sound I wouldn't be fucking asking you about it."). Allard's intent was not to care for the horse, who simply could have been withdrawn from the race, but to ensure that a limping horse would still be able to compete the next day. These calls belie Allard's insistence that no horses were harmed under his care. *See* Def. Sent. Mem. at 2-3. They also contradict the notion that Allard did what was best for his horses. *See id.* at 5 n.5. Had Allard cared about the welfare of his horses, he would not have subjected them to the drenches, injectables, and other unnecessary drugs that he routinely used to win races.

A sentence to a significant term of imprisonment is further necessary to afford adequate specific deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). The defendant misapprehends the seriousness of his offense. Allard's skewed and self-serving view of his offense conduct as merely having obtained prescription drugs without a valid prescription obscures the extent of his criminal violations, and the efforts he took to hide his conduct from those who could stop him. Those efforts included misleadingly labeling rooms in his barn that were filled with drugs as workspaces for a

licensed veterinarian; relying on that same veterinarian to provide alternative explanations for a positive drug test; and routinely submitting fraudulent prescription drug requests to pharmacies in order to obtain hundreds of thousands of dollars' worth of drugs. The defendant was the subject of numerous disciplinary proceedings while engaged in this offense; none of those violations stopped the defendant. Indeed, absent his arrest in this case, Allard would have continued to engage in the offense conduct, undeterred. A substantial term of imprisonment is thus necessary for this defendant.

Moreover, a sentence to a significant term of imprisonment is necessary to afford adequate general deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). Racehorse trainers, who are entrusted with the care and custody of racehorses, have unfettered access to these animals, and by extension are entrusted to ensure those horses' care and health. Like veterinarians, trainers are afforded certain latitudes under the assumption that they are acting in good faith as competitors and as custodians of racehorses. Individuals, like Allard, who abdicate their responsibilities to the racehorses under their care and control abuse that position of trust, knowing the difficulties in detecting and punishing such misdeeds. Racehorse trainers, in particular, assume that even if caught doping, they will have the means and wherewithal to litigate and dissemble, and thus continue their doping practices unencumbered. The Court should impose a sentence that signals to the community that serious consequences will follow for those who engage in the hazardous and illegal administration of PEDs to racehorses. A significant sentence will counter the pervasive view in the racehorse industry that administering PEDs is inconsequential and that the consequences of criminal activity will never amount to significant criminal penalties.

The defendant's comparisons between his conduct and that of others sentenced in the related case, *United States v. Navarro et al.*, 20 Cr. 160 (MKV), selectively cites from the record relevant to those defendants. The chief distinctions between Allard and the trainer-defendants in the *Navarro* case include the timing of Allard's plea, which occurred shortly before trial and after all dispositive motions had been resolved; the scale of Allard's crime, which yielded over $20 million in purse winnings—more than Marcos Zulueta, Christopher Oakes, Rick Dane, Jr., and Richard Banca *combined*[5]; the time period of Allard's offense conduct, which lasted from 2015 to 2020[6]; and the number of prior drug-related violations Allard faced, which should have, but did not, deter him from his crimes. *See United States v. Dane*, 20 Cr. 160 (MKV) (ECF No. 929) (trainer-defendant's Guidelines Range of 46 to 57 months' imprisonment based on loss amount of $1.5 to $3.5 million between 2017 and March 2020, automatically adjusted to Guidelines Sentence of 36 months' imprisonment; Dane sentenced to 30 months' imprisonment); *United States v. Zulueta*, 20 Cr. 160 (MKV) (ECF No. 791) (trainer-defendant's Guidelines Range of 30 to 36

---

[5] During the course of each respective defendant's offense conduct: Banca earned approximately $16 million; Oakes earned approximately $2.5 million; Dane earned approximately $2 million; Zulueta earned less than $1 million. By contrast, Allard earned close to $25 million during the course of his offense conduct.

[6] Banca engaged in the offense conduct for the same time period as Allard. (ECF No. 199). Oakes and Zulueta engaged in the offense conduct from 2019 to March 2020; Dane engaged in the offense conduct from 2017 to 2020; Navarro engaged in the offense conduct from 2016 to 2020. *See United States v. Navarro et al.*, 20 Cr. 160 (MKV) (ECF Nos. 283, 527, 539, 776).

months' imprisonment based on loss amount between $550,000 and $1.5 million between 2019 and March 2020; Zulueta sentenced to 33 months' imprisonment); *United States v. Christopher Oakes*, 20 Cr. 160 (MKV) (ECF No. 799) (Guidelines Range of 46 to 57 months' imprisonment based on loss amount of $1.5 to $3.5 million between 2019 and March 2020, automatically adjusted to Guidelines Sentence of 36 months' imprisonment; Oakes sentenced to 36 months' imprisonment); *United States v. Navarro*, 20 Cr. 160 (MKV) (ECF No. 608) (trainer-defendant's Guidelines Range of 168 to 210 months' imprisonment based on loss amount of $25 to $65 million automatically adjusted to Guidelines Sentence of 60 months' imprisonment; Navarro sentenced to 60 months' imprisonment). Despite committing his offenses for a longer time period and earning magnitudes more in purse winnings than these defendants, Allard nonetheless asks for a steep reduction in his sentence. Such leniency is not warranted, and would represent a significant departure from the sentences thus far imposed for convicted trainers.[7]

Allard's comparisons to defendants who are drug suppliers, not trainers, is imperfect and, in any event, does not counsel in favor of his desired 18-month sentence. The Government is not seeking the statutory maximum term of 36 months' imprisonment imposed on Kristian Rhein, *United States v. Kristian Rhein*, 20 Cr. 160 (MKV), who agreed to plead guilty before even filing his suppression motions, and before the Court had ruled on any dispositive motions, (ECF Nos. 429, 637). Rhein's co-conspirator, Michael Kegley, Jr., who likewise pled before any dispositive rulings, received a significant sentence of 30 years' imprisonment. Though Kegley was not discussed by Allard, his sentence further demonstrates why Allard's preferred sentence is anomalous. *See United States v. Kegley, Jr.*, 20 Cr. 160 (MKV) (ECF No. 641). Nor is the Government relying upon the 11-year and 42-month sentences imposed on trial defendants and drug suppliers Seth Fishman and Lisa Giannelli, who were similarly omitted. *See United States v. Fishman*, 20 Cr. 160 (MKV) (ECF No. 892); *United States v. Giannelli*, 20 Cr. 160 (MKV) (ECF No. 926).

Allard likens his conduct to two drug suppliers, Scott Robinson and Scott Mangini, each of whom received sentences of 18 months' imprisonment, rendering them outliers in comparison to all the other defendants sentenced in this matter. For both Robinson and Mangini, the Government advocated for the statutory maximum sentence of 60 months' imprisonment. *See United States v. Robinson et al.*, 120 Cr. 162 (JPO) (ECF Nos. 59, 63, 115, 121, 141). A comparison to Robinson is inapt, as Robinson was one of the first defendants across all the related cases to accept responsibility and plead guilty, doing so with no trial date scheduled, and having filed no dispositive motions. The quality of Robinson's acceptance of responsibility is incomparable to Allard's. With respect to Mangini, the defendant too readily glosses over shared aggravating factors that militate in favor of a significant sentence. [8] While Allard points to

---

[7] Allard likewise points to the trainer-defendant Murray Rojas, a trainer convicted of FDCA violations in connection with racehorse doping in the Middle District of Pennsylvania. *See* Def. Sent. Mem. at 9. Yet even in comparison to Rojas, who was sentenced to 27 months' imprisonment, Allard asks for a significant abatement for his sentence, that is entirely untethered from the nature and circumstances of his offense. As with the trainers in the Navarro case, such abatement is unwarranted.

[8] As noted in the Government's sentencing submission for Banca, Mangini argued that the drugs he and his co-conspirators sold via their direct-to-consumer website were purchased by

Mangini's pharmaceutical license as a point of distinction, he ignores his own trainer's license, and the duties that accompany such a position. *See* Def. Sent. Mem. at 10. Allard, too, was subject to a regime that placed in him greater trust and responsibility, and he abused that position. Like Banca and the other convicted trainers, Allard carried a duty of responsibility to the horses he trained, and a commensurate duty to the racing commissions who licensed him and the racetracks who rewarded him. He directly abdicated that duty by engaging in the offense conduct. Allard further claims that, unlike Mangini, he was not at the helm of a large scheme. *Id.* Not so. Allard employed up to 30 employees at a time, earned millions of dollars a year, and trained and raced horses across North America. He led his racing stable. Allard is correct to note that he did not manufacture, create, market, or supply drugs. Nonetheless, Allard was responsible for directly administering drugs to racehorses, and that conduct must be met with just punishment.

## IV.    Conclusion

The Government respectfully submits that a significant term of imprisonment comparable to similarly-situated defendants is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a).

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by:  /s/Sarah Mortazavi
Sarah Mortazavi
Assistant United States Attorney
252-637-2520

cc: Max Nicholas, Esq. (by ECF)

---

veterinarians, animal shelters, and other parties who were not involved in the racehorse industry. Mangini further pressed the argument that the vast majority of their sales revenue derived from sales of an oral omeprazole paste, which had little performance-enhancing value. While the Government disagreed on the extent, import, and basis of those assertions, that argument factored into the Court's sentencing determination. Those mitigating factors are inapposite for Allard.